JULIE A. PUCCI,

          Plaintiff,

v.                                             Case Number 07-10631

                                             Honorable David M. Lawson

NINETEENTH DISTRICT COURT,
and CHIEF JUDGE MARK W. SOMERS,

          Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING
## IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiff, Julie Pucci, has filed a second amended complaint alleging that she was wrongfully terminated from her job as an administrator in Michigan's Nineteenth District Court when defendant Mark W. Somers became that court's chief judge. She has pleaded four causes of action, but the foundation of her complaint is her belief that she lost her job when defendant Somers manipulated a court reorganization with the intention of eliminating her because her domestic relationship with Somers's rival, Judge William C. Hultgren, without benefit of marriage, clashed with Somers's religious beliefs. The defendants have filed a motion for summary judgment alleging that they are entitled to immunity under the Eleventh Amendment and the plaintiff has not produced evidence supporting the four remaining counts in her amended complaint. The plaintiff filed an answer and brief in opposition. The Court has reviewed the submissions of the parties and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(e)(2). The Court finds that the defendants are local units of government to which the Eleventh Amendment bar does not apply, and fact questions

preclude summary judgment on all but the plaintiff's religious discrimination count and parts of the plaintiff's retaliation count. Therefore, the Court will grant the motion for summary judgment in part and dismiss count III and part of count II of the second amended complaint, and deny the motion in all other respects.

## I.

Plaintiff Julie Pucci began her career with the Nineteenth District Court in March 1991 when she was hired as a court typist. The Nineteenth District Court serves the City of Dearborn. In December 1992, she took a position as a probation officer and judicial aide to Judge William Runco. In 1994, she became clerk of the court, and one year later she was promoted and became the assistant court administrator. In 1998, the plaintiff's position was reclassified to that of Deputy Court Administrator, and she reported to Court Administrator Doyne Jackson. This reclassification was approved by the Dearborn Civil Service Commission.

While the plaintiff was the deputy court administrator, she entered into a live-in relationship with William C. Hultgren, one of the court's judges. This relationship, which began in 2001, apparently caused no problems for the operation of the court until January 2003, when defendant Mark W. Somers was elected to replace a retiring judge of the court, who had been the chief judge.

The Nineteenth District Court is designated by statute as a "third class" district court, Mich. Comp. Laws § 600.8121(4), which means that the City of Dearborn "is responsible for maintaining, financing and operating the district court," Mich. Comp. Laws § 600.8103(3). The district court is an administrative unit unto itself, although it is subject to superintending control by the state supreme court. Mich. Comp. Laws § 600.8101(1). The administrative duties of the court, including

the authority to hire and fire court employees, fall to the chief district court judge. Mich. Ct. R. 8.110(C)(3) (2008).

At one time, multi-judge Michigan courts selected their chief judges by the vote of their members. *See* Mich. Ct. R. 8.110 (1985). In 1995, the Michigan Supreme Court changed the rule so that chief judges would be selected by the state supreme court to serve two-year terms. *See* Mich. Ct. R. 8.110(B) (1995). With the election of Judge Somers, the Nineteenth District Court bench consisted of Judges Hultgren, Wygonik, and Somers. Apparently, the supreme court could not find one of their number to serve as chief judge, so the court appointed Judge Leo K. Foran, a judge of a neighboring district court, to serve as the chief judge of the Nineteenth District Court. His tenure as chief judge began in March 2005 and concluded in January 2006, when defendant Somers was appointed chief judge.

The parties agree that the relationship between Judges Hultgren and Somers was acrimonious, although it is unclear when that bitterness developed. Perhaps that was one reason Judge Foran was selected to be chief of a court of which he was not a member. In any event, Judge Foran testified that the tension between the two was obvious from the first time he sat in a room with both of them.

Meanwhile, the plaintiff's service as deputy court administrator proceeded apparently without incident, and she received good reviews about her work. In 2004, however, she raised a complaint about Judge Somers's practice of interjecting his personal religious beliefs into judicial proceedings and the business of the court. The record indicates that Judge Somers used official court stationery on three separate occasions to send official correspondence affixing a quote from a biblical passage. Judge Foran stated that for the ten months that he served as chief judge, he

received ten or fifteen complaints from lawyers "about Judge Somers interjecting his religious beliefs from the bench or imposing sentences based on religion." Def.s' Mot., Ex. F, Foran Dep. 62. One example was when a "Muslim boy got a stiffer sentence by the judge because of the fact that whatever offense he had, it happened during Ramadan." *Ibid.* Others complained that Judge Somers lectured defendants about marijuana, declaring that it was the devil's weed or Satan's surge, and that he would ask litigants in court if they go to church. The plaintiff reported these incidents to Mr. Jackson, her supervisor, and regional court administrator Jan Hunt-Kost. Another court employee, Nancy Siwik, actually filed a complaint against Judge Somers with the state judicial tenure commission. There is no evidence in the record of the outcome of the tenure commission complaint, but the regional court administrator instructed Judge Somers to desist from using court stationery to send religious messages.

On March 30, 2005, Judge Foran announced his intention to reorganize the court's administrative structure. He planned to have "Sharon Langen remain as clerk of the court," move the plaintiff to court administrator, and not fill the position of deputy court administrator. Def.s' Mot., Ex. F, Foran Dep. 14-15. Judge Foran testified that the plaintiff was the natural successor for retiring court administrator Jackson. He said:

> [S]he was doing the job as the court administrator anyway. She was accepted, highly regarded, and respected by any attorney that ever talked to me about her and highly respected and regarded in the community at large.

Def.s' Mot., Ex. F, Foran Dep. 10. While Mr. Jackson was the court administrator, he had delegated a large number of his duties to the plaintiff. Pl.'s Resp., Ex. 8, Somers Dep. 121.

Judge Somers vigorously opposed the plaintiff's elevation to court administrator because of her relationship with Judge Hultgren. He believed that there was "an inherent conflict," Pl.'s Resp.,

Ex. 8, Somers Dep. 133, and eventually he embarked upon a campaign to have the plaintiff removed as a court employee.

On March 31, 2005, Judge Somers sent a memo to Judge Foran complaining about the plaintiff's promotion. It states:

> Judge Hultgren and myself have had some rather candid and, one might say, pointed conversations regarding the effect of his engagement to and live-in relationship with a court employee. I believe I can fairly characterize his position by stating he does not believe that relationship should prevent him from being chief judge and that he also believes it should not prevent Ms. Pucci from being promoted to court administrator upon the retirement of Mr. Jackson this summer, although he has said he would gladly relinquish any claim to the chief judge position if Ms. Pucci gets the administrator position. Moreover, he believes that Ms. Pucci should *automatically* get the job without any competition and that anything to the contrary would be "an insult". Judge Hultgren has gone so far as to tell me that this is "personal" to him, that he will never support me for the chief judge position if I oppose Ms. Pucci's appointment to court administrator and that he will do everything he can to get Judge Wygonik on his side of this issue. I wholeheartedly and completely disagree with Judge Hultgren's position in every respect. Although the present anti-nepotism rule technically applies only to married couples in this situation, I see no ethical or moral ground for standing upon technicalities. We are judges elected to serve our community and should willingly hold ourselves to the highest of standards. I am not the first to say that Judge Hultgren cannot serve as chief judge under these circumstances – the Supreme Court has already done that. If need be, I will be the first to say that for the very same reasons Ms. Pucci cannot serve as court administrator.
>
> I implore you to prevail upon my colleague and explain the impossibility of his position in this matter. As I have said to him directly, I am happy for them both to have found each other and to be in a loving relationship but their relationship comes with limitations for the workplace. The position I have been blessed with here is alike a dream come true. There is nothing I desire more than harmony in this court that for far too long suffered under the personal battles of its judges. I truly believe that you are the person whose good counsel will be accepted by my colleague.

Pl.'s Resp., Ex. 10.

Judge Foran responded a day later:

I have read your letter of March 31 with great interest. However I must advise you that in keeping with my mandated responsibility to provide the 19th District Court with the best possible administration I have informed the control unit in a March 30

writing that Mr. Jackson is leaving in June and that Ms. Pucci will be his replacement.

Therefore, it is not necessary for me to comment on the merits of your presentation.

Pl.'s Resp., Ex. 11.

Judge Somers was still unhappy. On April 5, 2005, Judge Somers sent a note to Judges Hultgren and Wygonik. He states

> I am deeply troubled by the apparently calculated manner in which Ms. Pucci's succession to the court administrator position has been handled. The issue was placed on the agenda for our last judge's meeting but never discussed. This has been a sensitive issue between Judge Hultgren and myself for some time. Now, without the courtesy of consultation or discussion, Ms. Pucci's appointment is presented as a *fait accompli*. These issues are *not* personal to me. They are matters of principle and ethics. Our individual and collective integrity and the integrity of this court are at stake.
>
> As you can see from my missive to Ms. Green, I have every intention of testing the legality of this appointment under the Supreme Court's anti-nepotism policy (attached) and the Cannons - in particular Cannon 2 and Cannon 5.

Def.'s' Mot., Ex. C, Pucci Dep., Ex. 9 (footnotes omitted) (spelling of "cannon" in original).

Judge Somers also wrote to regional court administrator Deborah Green asking her to reverse Judge Foran's decision and prevent the plaintiff from becoming the court administrator. He pointed to an anti-nepotism rule that the state supreme court had implemented by administrative order in 1996, which stated that "[r]elatives of . . . judges or court administrators shall not be employed within the same court." Def.'s' Mot., Ex. C, Pucci Dep., Ex. 8. (Administrative Order No. 1996-11). A "relative" was defined specifically as a "spouse, child, parent, brother, sister, grandparent, grandchild, first cousin, uncle, aunt, niece, nephew, brother-in-law, sister-in-law, daughter-in-law, son-in-law, mother-in-law, and father-in-law, whether natural, adopted, step or foster." *Ibid.* Judge Somers told Ms. Green that the plaintiff would not be allowed to work in the court at all if she actually were married to Judge Hultgren.

On April 14, 2005, Judge Somers wrote a letter to state court administrator Carl Gromek, asking him to reverse Judge Foran's appointment of the plaintiff as court administrator, remove Judge Foran as chief judge, and expand the terms of Administrative Order 1996-11 to include "domestic partners" among those disqualified from court employment, which would result in the plaintiff's termination from her court position. One week later, Somers wrote Gromek another letter accusing Judges Foran and Hultgren of conspiring in "calculated efforts to conceal the whole truth from the public" and pledging to "see these matters through to an appropriate end." Pl.s' Resp., Ex. 15.

On May 5, 2005, Judge Foran issued a memo appointing the plaintiff as interim court administrator and accepting Mr. Jackson's resignation. However, on May 10, 2005, Carl Gromek sent Judge Foran a letter that states:

> I referred this matter to the Court, and the Justices have concluded that Ms. Julie A. Pucci's romantic partnership with Judge Hultgren is a violation of the spirit of its antinepotism rule. While the Court is of the view that Ms. Pucci may remain employed with the 19th District Court in the capacity that predated her romantic relationship with Judge Hultgren, she cannot be advanced or otherwise be advantaged after the beginning of her romantic relationship with Judge Hultgren. Accordingly, Ms. Pucci will not succeed Doyne E. Jackson as Court Administrator.

Def.s' Mot., Ex. C, Pucci Dep., Ex. 6. The status and legal effect of this letter is confusing and not readily apparent under state law. The court rule prescribing the powers and duties of chief judges states that "[a] chief judge shall act in conformity with the Michigan Court Rules, administrative orders of the Supreme Court, and local court rules, and should freely solicit the advice and suggestions of the other judges of his or her bench and geographic jurisdiction." Mich. Ct. R. 8.110(C)(1). However, Mr. Gromek's letter was neither a "Michigan Court Rule," "administrative order[] of the Supreme Court," nor a "local court rule[ ]." The plaintiff's attorney's subsequent

efforts to obtain clarification of the letter's status from the supreme court ultimately went unanswered.

Nonetheless, when Judge Foran learned that the appointment of the plaintiff as court administrator was discouraged, he chose to appoint Ms. Langen to that position, kept the plaintiff in her then-current position as deputy court administrator, and did not fill the clerk of the court position. This arrangement was consistent with his desire to hire from within because it was good for morale. Def.s' Mot., Ex. F, Foran Dep. 6. In a May 16, 2005 memo, Judge Foran wrote:

> Because of unforeseen developments, I have decided against filling this position with an interim appointment. Instead, I have decided to appoint from within and am appointing our current Clerk of the Court, Sharon Langen, as the new 19th District Court Administrator, effective June 2, 2005.

Pl.s' Resp., Ex. 19.

For the remainder of 2005, Judge Foran served as chief judge, Ms. Langen served as court administrator, and the plaintiff served as deputy court administrator. Judge Foran was "perfectly satisfied with everything they were doing. They were doing an excellent job, and the job of administering the court was being done." Pl.'s Resp., Ex. 2, Foran Dep. 18. There were no grievances and no complaints from staff or the community.

In mid-November, 2005, Judge Somers was appointed to a two-year term as chief judge. On January 10, 2006, John Hazime was demoted from Work Program Director to Court Officer. Judge Somers told Mr. Hazime that this was done solely for budgetary reasons. However, Mr. Hazime testified that he believed that he lost the position due to his friendship with the plaintiff and Judge Hultgren. Pl.'s Resp., Ex. 4, Hazime dep. at 14-15.

Then Judge Somers began to find fault with the job Ms. Langen was doing as clerk of the court. He stated that he did not have confidence in Ms. Langen, that she was unable to perform the

duties of court administrator. Pl.'s Resp., Ex. 8, Somers Dep. 135-37. "She's too timid in dealing with other people. She didn't have any real response to the demands to cut personnel. Julie [Pucci] did a better job in that regard . . . ." *Id.* at 144.

On June 12, 2006, Judge Somers e-mailed regional court administrator Green, stating: "I would like the opportunity to talk with you in the not-too-distant future concerning potential administrative changes here at the 19th." Pl.'s Resp., Ex. 22. Ms. Green spoke to Judge Somers, and sent him an e-mail on July 21, 2006 that states:

> Hope I was of some help, you have a difficult and delicate situation on your hands. One thing that occurred to me after I left – you might want to inquire as to when Julie is eligible for retirement. You asked about possible legal ramifications, and if my memory serves Dearborn has an "all or nothing" retirement system that I thought Julie was very close to vesting in. Terminating her on the eve of her vesting might be seen as suspect if she sues. If she vests it might also give you and she a graceful way out.

*Ibid.* On October 10, 2006, Judge Somers sent out memo announcing another administrative reorganization. He proposed to retain one court administrator and one clerk of the court and eliminate the position of deputy court administrator, held by the plaintiff. Sharon Langen was to continue as the court administrator until a new one was hired, and then she would be reassigned to the clerk of court position. Judge Somers permitted the plaintiff to stay with the court until January 1, 2007, which had some effect on her eligibility for retirement benefits. The plaintiff requested, but was denied, a severance package.

When the plaintiff was first employed as a court typist, she was a member of a labor union. She did not retain her union status through her various promotions, but she never signed an "at-will" employment agreement, as did some other court employees. She testified that the court does not have any personnel policies or employee handbooks, so it has "always adopted the City of

Dearborn's." Def.'s Mot., Ex. C, Pucci Dep. 64, 66. The plaintiff submitted an affidavit that non-union court employees were treated in the same manner as union court employees, and she reasonably believed that she could only be discharged for cause. Pl.'s Resp., Ex. 32, Pucci Aff. ¶¶ 5, 8, 11. The court's practice was consistent with the policies of the city, such as giving progressive discipline, and the court "wouldn't just fire somebody to fire them." Def.s' Mot., Ex. C, Pucci Dep. 67. The plaintiff also related events involving the termination of two male employees years earlier, Robert Cardoni and Lloyd Hren, who both were given severance packages consisting of a lump sum payment and six months of health insurance, in exchange for signing a waiver of their employment rights.

Gary Dodge was selected for the court administrator position. According to the plaintiff, Mr. Dodge does not have a college degree or any district court or Michigan court experience. Def.s' Mot., Ex. C, Pucci Dep. 103. Mr. Dodge is the nephew of a member of Judge Somers' Kiwanis Club, a fact that Judge Somers disclosed to Ms. Green. Def.s' Mot., Ex. E, Somers Dep. 193. Mr. Dodge previously had worked as a court administrator for a court in Chicago, but was told to resign or be fired because the judges "couldn't work with [him] anymore" and "didn't trust [him]." Pl.'s Resp., Ex. 36, Dodge Dep. 19-21.

The deputy court administrator position was eliminated, and the plaintiff lost her job, despite Judge Somers's professed satisfaction with her job performance. The only open position was the clerk's position, for which Ms. Langen, with ten years experience in that role, was "the natural choice." Pl.'s Resp., Ex. 8, Somers Dep. 40. Initially the plaintiff was offered the chance to receive a cash payment for one-half of her sick days. However, Judge Somers changed his mind on that offer when he learned that the plaintiff found employment with the city of Dearborn.

When threatened with a lawsuit, Judge Somers wrote a letter to the plaintiff's attorney denying any illegal motive in his termination of the plaintiff. He offered reasons as to why he was dissatisfied with her job performance, and insisted that he merely "implement the same organizational plan that was already in the works under Judges Foran and Hultgren before the Michigan Supreme Court intervened with regard to Ms. Pucci's promotion." Pl.'s Resp., Ex. 26 (2/7/07 letter from Somers).

Judge Foran testified that he believes Judge Somers fired the plaintiff because he did not like her and did not approve of her lifestyle. Def.s' Mot., Ex. F, Foran Dep. 42. He stated that he found the defendants' invocation of his name as justification for their conduct "laughable, outrageous, and prevaricative." *Id.* at 42.

The plaintiff's complaint in this Court has been amended twice. She sought and was granted leave to file a third amended complaint, but the record shows no such filing. Presently, the operative complaint contains four counts: count I alleges violation of 42 U.S.C. § 1983 for "due process" violations; count II alleges retaliation for conduct protected by the First and Fourteenth Amendments; count III alleges religious discrimination in violation of the Michigan Civil Rights Act; and count V alleges sex discrimination in violation of the Michigan Civil Rights Act. Count IV was dismissed by stipulation, and the city of Dearborn was dismissed as a defendant, also by stipulation.

## II.

The defendants have moved for summary judgment on all counts of the amended complaint. They claim Eleventh Amendment immunity from the federal claims in counts I and II; they argue that the plaintiff had no protectable property interest under count I and no protectable conduct

alleged in support of the retaliation claim in count II. They also contend that the plaintiff has not offered evidence on the religious and sex discrimination claims in counts III and V.

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002). Thus a factual dispute which "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment which is properly supported. *Kraft v. United States*, 991

F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). "[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Thus, the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there

must be evidence on which the jury could reasonably find for the plaintiff." *Ibid.* (quoting *Anderson*, 477 U.S. at 252) (internal quote marks omitted).

<div align="center">A.</div>

The defendants first argue that the Nineteenth District Court and Judge Somers (in his official capacity) have Eleventh Amendment immunity from suit in federal court. They reason that the court is an arm of the state, and they point to a similar case in which another judge of this court that state district courts are entitled to sovereign immunity for damage suits. *See Englar v. 41B Dist. Court*, 2006 WL 2726986, 2006 U.S. Dist. LEXIS 68157 (E.D. Mich. Sept. 22, 2006). The plaintiff disputes this claim on the ground that the most important factor in determining whether an entity has sovereign immunity – whether the state treasury must pay a judgment rendered against the entity – augurs in favor of no immunity. Sovereign immunity does not apply, the plaintiff insists, because the judgment will be paid by the City of Dearborn, not the state.

"It is well-settled that a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment." *Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993) (internal citations and quotations omitted). "When suit is brought against a public agency or institution, and/or its officials, the application of the Eleventh Amendment turns on whether said agency or institution can be characterized as an arm or alter ego of the state, or whether it should be treated instead as a political subdivision of the state." *Ibid.* Whether the judgment will be paid from the treasury is the most important factor in determining whether an entity has sovereign immunity. *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 49-50 (1994); *Hutsell*, 5 F.3d at 999 ("The most important factor in resolving this question, however, is whether any monetary judgment would be paid out of the state treasury.").

<div align="center">-14-</div>

This is because the "the impetus for the Eleventh Amendment [was] the prevention of federal-court judgments that must be paid out of a State's treasury." *Hess*, 513 U.S. at 48. Other factors include the "status of the entity under state law," the amount of control the state has over the entity, and whether the "entity is concerned with state-wide or local issues." *Alkire v. Irving*, 330 F.3d 802, 812-13 (6th Cir. 2003).

The Sixth Circuit held that these factors should apply to a determination of the Eleventh Amendment's applicability to a suit against a local court. *Alkire*, 330 F.3d at 813; *see also Cash v. Hamilton County Dept. of Adult Probation*, 388 F.3d 539, 545 (6th Cir. 2004) ("A final resolution of this issue will turn on factual findings regarding whether the Department of Adult Probation is part of the Ohio court system and whether the State or the County would pay damages for a constitutional violation perpetrated by the Department.").

At least two other judges of this District have concluded that district courts in Michigan are entitled to sovereign immunity. In *Englar v. 41B Dist. Court*, 2006 WL 2726986, 2006 U.S. Dist. LEXIS 68157 (E.D. Mich. Sept. 22, 2006), Judge Borman wrote:

> First, it is clear that the employees of 41B District Court are employees of the state judicial branch and not employees of Clinton Township. Michigan law recognizes that employees of the judicial branch "are not employees of the county, city, or other district control unit, even though they are paid by the district control unit." *Judges of the 74th Judicial District v. Bay County*, 385 Mich. 710, 723 (1971). Second, as a matter of law, this Court finds that Defendant 41B District Court is an "arm of the state" entitled to sovereign immunity in suits for damages in federal court.

*Id.* at *5; *see also Geller v. Washtenaw County*, 2005 WL 3556247 (E.D. Mich. Dec 29, 2005) (Borman, J.). Judge Gadola reached the same conclusion in a published decision:

> Michigan Circuit Courts, are funded in part by the county in which they are located.

In *Ernst*, the Sixth Circuit, while again leaving open the question of whether other factors may be considered in the arm of the state analysis, stated that "when no evidence is presented regarding the issue of whether the funds to satisfy a judgment would come from the state treasury, the other factors may be considered." 379 F.3d 373, 381, (citing *Dubuc v. Mich. Bd. of Law Examiners*, 342 F.3d 610, 615 (6th Cir.2003)). "The parties have not submitted any evidence regarding whether the State of Michigan would be ultimately responsible for any money judgment against the Board or the Bar. The other factors, however, weigh in favor of finding the Board and the Bar immune from this lawsuit."

In this case, the parties have not presented any evidence showing whether the State of Michigan would be responsible for a money judgment against the Defendant Circuit Courts. The Court, while noting that the Sixth Circuit has expressly left undecided the question of whether the impact on the state treasury is the only factor to be considered in the analysis, finds that, in such a situation, where no evidence as to funding is available, it may consider other factors in its analysis. Specifically, the Court, in the absence of evidence on the most important factor, looks to the "dignity" factor examined by the Sixth Circuit in S.J., 374 F.3d at 421. The Court, in examining this factor, finds that Defendant Circuit Courts, like the Ohio county court in S.J., are the "adjudicative voice" of the State of Michigan, created pursuant to the Michigan Constitution and subject to the supervision of the Michigan Supreme Court. As such, they are "arms of the state," entitled to the sovereign immunity provided to the State of Michigan itself. Accordingly, the Court affords Defendants Oakland County Circuit Court and Clinton County Circuit Court Eleventh Amendment immunity and grants their Motions to Dismiss.

*Smith v. Oakland County Circuit Court*, 344 F. Supp. 2d 1030, 1056 (E.D. Mich. 2004).

The Court finds neither of these cases persuasive in the present matter, however, because neither focused on the "most important factor" of the state treasury's exposure to a judgment in the event of liability. In this case, the responsibility for funding a third class district court – such as the Nineteenth District Court – lies with the local unit of government, here the city of Dearborn. *See* Mich. Comp. Laws §§ 600.8121(4), 600.8103(3). Michigan law confirms that the State is not responsible for claims by employees arising from their employment by a district court. Michigan Compiled Laws § 600.591(12) expressly states: "Except as otherwise provided by law, the state is not the employer of court officers or personnel and is not liable for claims arising out of the

employment relationship of court officers or personnel or arising out of the conduct of court officers or personnel." Consequently, the state is not responsible for employment-related claims. *Kain v. State*, 109 Mich. App. 290, 311 N.W.2d 351 (1981) (holding that assignment clerk for district court was not a city employee or state employee but, instead, was an employee of judicial district, whose costs were to be paid by the "local control unit," and thus state was not liable for workers' compensation benefits to clerk's dependents following his death which arose out of and in course of his employment). The state supreme court has applied this concept to employment discrimination cases brought by court employees. *See Cameron v. Monroe County Probate Court*, 457 Mich. 423, 426-27, 579 N.W.2d 859, 862 (1998) (observing that "[t]he county contends, correctly, that employment discrimination is not an 'expense of justice,'" and holding that "supervision and administration of court personnel is a necessary expense of justice for which the county is expected to pay").

It is apparent in this case that any judgment against Judge Somers or the Nineteenth District Court must be satisfied by the city of Dearborn, not the state treasury. The Supreme Court and Sixth Circuit have suggested that this fiscal money judgment issue, if not dispositive, is the most important factor. Because the state will not pay for a money judgment here, sovereign immunity does not bar suit against the defendants.

B.

On the federal claims, the plaintiff has sued Judge Somers in both his individual and his official capacities. The defendants argue that the official capacity claim (and presumably the claim against the district court itself) must fail because there is no link between a municipal policy or custom and the constitutional violation, as required by *Monell v Dep't of Soc. Serv.s*, 436 U.S. 658, 691 (1978). The defendants reason that the plaintiff "has not made any showing that Somers' actions (i.e., the reorganization) represented 'official policy or custom' of the 19th District Court or the judicial branch of the State of Michigan." Def.s' Mot. for Summ. J. 8. She only complained about the plan when the Michigan Supreme Court interpreted its anti-nepotism policy.

The Court finds this argument unpersuasive. The Supreme Court has held that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. However, "[a] municipality may be liable under Section 1983 for actions of its authorized policymakers 'where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Adair v. Charter County of Wayne*, 452 F.3d 482, 493 (6th Cir. 2006) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). A policymaker is the final authority if his "'decisions are final and unreviewable and are not constrained by the official policies of superior officials.'" *Ibid.* (quoting *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)). A final policymaker is more than a final decisionmaker; a final policymaker is charged with the duty to "formulate[ ] plans for the implementation of broad goals." *Miller v. Calhoun County*, 408 F.3d 803, 814 (6th Cir. 2005) (alteration in original).

The plaintiff complains of Judge Somers's decision to eliminate her position and fire her. Under Michigan law, the chief judge is authorized to coordinate the court's finances, including the duty to "supervise the performance of all court personnel, with authority to hire, discipline, or discharge such personnel." Mich. Ct. R. 8.110(C)(3)(d). Judge Somers acted pursuant to this authority when he terminated the plaintiff.

The defendants seek cover from the letter of Mr. Gromek that says the plaintiff cannot become the court administrator. However, that letter provides no safe harbor since it had neither the force of law nor the power of administrative direction as set forth in the Michigan court rules prescribing the supreme court's superintendence over administrative matters. *See* Mich. Ct. R. 8.110(C)(1) (requiring a chief judge's obedience only to "the Michigan Court Rules, administrative orders of the Supreme Court, and local court rules"). Moreover, the decision to implement the court reorganization and fire the plaintiff was Judge Somers's and his alone. When he became chief judge, he chose to set in motion a course of events that he knew would lead inevitably to the plaintiff's termination from a position that even the state supreme court said she could retain. If his decision was animated by an illegal motive, he is liable in his individual capacity and his official capacity as the final policymaker for the district court, and the district court shares that liability.

C.

The defendants next attack the plaintiff's claim alleging a denial of procedural due process. Pucci's claims that the defendants violated her constitutional rights are brought pursuant to 42 U.S.C. § 1983, under which the plaintiff must prove (1) that there was a deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under of color of state law. *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003). Since the

plaintiff was a court employee, there is no dispute over the second component. The defendants argue that Pucci cannot prove a violation of the Due Process Clause because she was an at-will employee and she had no property interest in continued employment that was protected by the Constitution.

The Fourteenth Amendment to the Constitution prohibits State and local governments from "depriv[ing] any person of life, liberty, or property, without due process of law[.]" Federal courts consistently have recognized that state civil servants may have a property interest in continued employment under certain circumstances and must be afforded due process before being discharged. *See, e.g., Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1986); *Relford v. Lexington-Fayette Urban County Government*, 390 F.3d 452, 460 (6th Cir. 2004) (stating that "[u]nder state law, government and civil service employees may have a property right in their continued employment"). A claimed due process violation is analyzed in two steps. First the court must determine whether a protected property interest exists; absent an interest, no right to due process is present. *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 565 (6th Cir. 2004). The second step, if the first is answered in the affirmative, poses the question of what process is due. *Ibid*; *see also Johnston-Taylor v. Gannon,* 907 F.2d 1577, 1581 (6th Cir. 1990).

The formality of the process due under federal law "depends upon the importance of the [property] interest" at stake. *Farhat v. Jopke*, 370 F.3d 580, 595 (6th Cir. 2004). The Supreme Court has recognized that a municipal employee can have a property interest in continued employment; however, such "property interests are not created by the Constitution[;] 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . . .'" *Loudermill*, 470 U.S. at 538 (quoting *Board of Regents*

*v. Roth*, 408 U.S. 564, 577 (1972)).  Generally, a showing that a civil servant may be fired only for cause, by operation of state contract law, statute, or administrative rules and regulations is sufficient to trigger the second step of the analysis.  *Farhat*, 370 F.3d at 595.

Michigan law provides three methods by which a plaintiff can prove he is a "just cause" employee: "(1) proof of 'a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause;' (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a 'legitimate expectation' of job security in the employee." *Lytle v. Malady (On Reh)*, 458 Mich. 152, 164, 579 N.W.2d 906, 911 (1998).  In this case, the parties agree that the plaintiff can point to no contractual provision guaranteeing just cause termination.  Nor has the plaintiff produced any evidence of an express written or oral agreement. However, the Court believes that the plaintiff has come forward with evidence that creates a fact question as to the employer's policies and procedures creating a legitimate expectation of a secure job that would not be withdrawn absent just cause.

Although in Michigan, the "default principle" is that employment is at-will, *Mannix v. County of Monroe*, 348 F.3d 526, 532 (6th Cir. 2003), the city of Dearborn protects its civil servants from termination except for "good cause."  Such a policy creates a property interest subject to constitutinal protection.  *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (noting that "[t]he Supreme Court has recognized that when a state statute provides that 'classified civil service employees' may be dismissed only for cause, the statute creates a property interest in one's employment that is protected by the Fourteenth Amendment").  Although not expressly adopted by the court, the plaintiff testified that the court implicitly adopted the policies.  The evidence bears this

out: two individuals who were terminated received severance packages and the city's civil service commission got involved when the plaintiff's job was reclassified. The plaintiff has created an issue of fact whether, by implicitly adopting these policies – even voluntarily, and in a non-contractual manner – the court created an expectation of continued employment under *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich. 579, 613, 292 N.W.2d 880, 892 (1980) (holding that "[i]t is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation 'instinct with an obligation'"). The plaintiff then had a property interest in continued court employment.

It appears that the parties do not dispute that the plaintiff was not provided with any pre-termination procedural process. Sixth Circuit precedent makes clear "that in the pretermination stage, the employee does not have a right to, and the Constitution does not require, a neutral and impartial decisionmaker. The 'right of reply' before the official responsible for the discharge is sufficient." *Farhat*, 370 F.3d at 595. But the plaintiff was not even afforded that in this case.

In *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990), the Sixth Circuit held that due process before termination means "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer." At the pre-termination stage, "the elements required for due process are notice and an opportunity to respond." *Farhat*, 370 F.3d at 595 (internal citations and quotations omitted).

The Court believes that the defendants are not entitled to summary judgment on the plaintiffs' violation of due process claim.

D.

The defendants also attack count II of the amended complaint, which alleges retaliation for exercising a number of constitutional rights. That count of the amended complaint is not a model of clarity, and the Court finds merit in the defendants' argument that there is no evidence of a violation of the plaintiff's right to association with Judge Hultgren or the exercise of her own religious practices. To the extent that the complaint can be read as an oblique challenge to the court's anti-nepotism policy, that challenge must fail. "Virtually every court to have confronted a challenge to an anti-nepotism policy on First Amendment, substantive due process, equal protection, or other grounds has applied rational basis scrutiny." *Montgomery v. Carr*, 101 F.3d 1117, 1126 (6th Cir. 1996). Consistent with this rule, when an employee is terminated due to an intimate relationship, the Sixth Circuit applies rational basis review. *Beecham v. Henderson County*, 422 F.3d 372, 374, 378 (6th Cir. 2005).

"The Supreme Court has held that rational-basis review is satisfied 'so long as there is a plausible policy reason' for the decision, *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992), and it is 'entirely irrelevant for constitutional purposes' whether the plausible reason in fact motivated the policymaker, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993)." *Beecham*, 422 F.3d at 378. There certainly is a plausible reason in this case for the anti-nepotism policy itself, even though the plaintiff did not fall literally within the terms of that policy.

But the Court does not read count II of the amended complaint so narrowly. Although the plaintiff has not come forward with evidence that Judge Somers engineered the reorganization to

eliminate her job because of his rejection of *her* religious practices or association with Judge Hultgren, the complaint can be read to include a claim for retaliation due to the plaintiff's complaints of Judge Somers's own practice of preaching his religion from the civil bench.

A public employee pleads a viable claim for retaliation in violation of the First Amendment if she demonstrates that "(1) [s]he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by his protected conduct." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If the plaintiff makes this showing, the burden then shifts to the defendant to show by a preponderance of the evidence "that it would have taken the same action even in the absence of the protected conduct." *Jackson v. Leighton*, 168 F.3d 903, 909 (6th Cir. 1999) (quotation omitted); *see also Mt. Healthy*, 429 U.S. at 287.

The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). However, in this case, there is evidence that the plaintiff complained "as a citizen," Def.s' Mot., Ex. C, Pucci Dep 28, about Judge Somers's practice of religiosity in his judicial pronouncements, and those complaints were lodged with local and state officials. The plaintiff plainly was speaking out on a matter of public concern. "Matters of public concern include speech that 'relat[es] to any matter of political, social, or other concern to the

community.'" *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Such speech calls attention to the functioning of government, misconduct of public employees or officials, or breaches of public trust. *See Connick*, 461 U.S. at 148; *Rodgers*, 344 F.3d at 596; *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001).

In determining whether there is sufficient evidence to warrant a trial on the causation element, "th[e] analysis focuses on whether the adverse employment action was motivated in substantial part by the plaintiff's constitutionally protected activity." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 431 (6th Cir. 2000). The temporal proximity between the complaint and the termination can demonstrate discriminatory animus. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 565 (6th Cir. 2004).

In this case, Judge Somers set in motion the process to eliminate the plaintiff's job within months of his assumption of authority as chief judge. Moreover, the record contains abundant evidence of his animosity toward the plaintiff's continued employment with the court and his efforts to remove her from the employee roles even before he assumed that position. A jury could conclude from this evidence that Judge Somers's motives for removing the plaintiff were unconstitutional and retaliatory. Therefore, that portion of count II alleging retaliatory discharge for the exercise of First Amendment speech rights may proceed to trial, although the balance of that count will be dismissed.

Lastly, defendant Somers claims qualified immunity on this claim against him in his individual capacity. However, the right to speak out on matters of public concern is clearly established, and it would have been plain to a reasonable person in the defendant's position that he could not retaliate against a person complaining about his judicial misconduct without running afoul of the First Amendment.

## E.

The defendants next argue that the plaintiff's claim of religious discrimination under state law must fail because she has not shown that she was qualified for the court administrator position. That position was a level above the deputy court administrator position, with higher pay and more responsibility, and the state supreme court advised Judge Foran that the plaintiff could not improve her position with the Nineteenth District Court. The defendants also argue that the plaintiff has not shown that the defendants treated the plaintiff differently than individuals with different religious views. The plaintiff answers that she was a member of the protected class of people who did not share Somers' view of non-marital intimate relationships, she was fired, and Somers was predisposed to discriminate against people in her position and actually did so.

Under the Michigan Civil Rights Act, "(1) An employer shall not do any of the following: (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion . . . " Mich. Comp. Laws § 37.2202(1)(a). Michigan's Elliot Larson Civil Rights Act tracks federal law, and the Michigan courts often refer to Title VII jurisprudence when evaluating such claims. *See Robinson v. Ford Motor Co.*, 277 Mich. App. 146, 153, 744 N.W.2d 363, 367-68 (2007). A person alleging a violation of the Civil Rights Act has the initial burden of establishing that her employer discriminated against her because of religion.

After examining the record in this case, despite all of Judge Somers's proselytizing, the Court has not found evidence that Judge Somers actually disapproved of the plaintiff because she was cohabitation with Judge Hultgren out of wedlock. One might assume that such practice might

offend Judge Somers's brand of morality, but there is no evidence that he expressed such disapproval or acted on it in making employment decisions.

There is evidence that the plaintiff was qualified to perform the job of court administrator. Moreover, the evidence is plain that Judge Somers did not want the plaintiff employed in the Nineteenth District Court, that the reason for his intense desire to get rid of her was her relationship with another judge of that court, and that his motivation to implement a discarded court reorganization plan could be viewed as a pretext for his true mission of eliminating the plaintiff's job. But none of this can be tied to "discriminat[ion] . . . because of religion." Mich. Comp. Laws § 37.2202(1)(a). The Court finds, therefore, that the defendants are entitled to summary judgment on count III of the amended complaint.

<center>F.</center>

Finally, the defendants challenge that plaintiff's claim of sex discrimination on the premise that she was not qualified for Court Administrator, so she cannot base her discrimination claim under the *McDonnell Douglas* framework when she was not placed in that position. The defendants' argument misses the mark, however. First, there is no state law, rule of administrative order that renders the plaintiff unqualified for the position. As noted earlier, the legal effect of the letter from Mr. Gromek is questionable, and it is unclear that the defendants were entitled to act on it. Second, it is pellucidly clear that the plaintiff was qualified for the position as deputy court administrator. The defendant's action sought to eliminate that position – and thereby the plaintiff herself – from the rolls of the court's employees. She was replaced by a male whose qualifications were demonstrably inferior to hers. Third, the defendants claim that they had a legitimate reason for implementing court reorganization, which suggests that the motives for firing the plaintiff through

<center>-27-</center>

job elimination were mixed. The Sixth Circuit recently has held in the Title VII context that "the *McDonnell Douglas/Burdine* burden-shifting framework does not apply to the summary judgment analysis of Title VII mixed-motive claims." *White v. Baxter Healthcare Corp.*, --- F.3d ----, 2008 WL 2607893, at *14 (6th Cir. Jul. 3, 2008). Instead, in order "to survive a defendant's motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was a motivating factor for the defendant's adverse employment action." *Ibid.* (citations and quotations omitted). Since state law discrimination claims parallel the Sixth Circuit's Title VII jurisprudence, *see Meyer v. City of Center Line*, 242 Mich. App. 560, 569, 619 N.W.2d 182, 188 (2000), the plaintiff's sex discrimination claim should be analyzed under *White*'s new test. The plaintiff's evidence easily satisfies that test.

Summary judgment on count V, therefore, will be denied.

### III.

The Court finds that the defendants are not entitled to immunity under the Eleventh Amendment claims, the plaintiff has not come forward with sufficient evidence of religious discrimination, and fact questions preclude summary judgment on the remaining claims, except for portions of count II of the amended complaint.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt #31] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that count III (religious discrimination) and that part of count II of the second amended complaint alleging a retaliation for exercising rights other than rights of free

speech are **DISMISSED WITH PREJUDICE**.  The plaintiff must file a third amended complaint

to clarify her free speech retaliation claim on or before **July 24, 2008**.

It is further **ORDERED** that counsel for the parties appear before the Court for a status

conference on **August 11, 2008, at 4:00 p.m.**


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   July 10, 2008

<div style="border: 1px solid black;">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on July 10, 2008.

s/Felicia M. Moses
FELICIA M. MOSES

</div>